## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DAVID CHAPPELL, individually, and on behalf of a class of similarly situated individuals, | **Civil Action No.:** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| MERCEDES-BENZ USA, LLC, a New Jersey corporation, and MERCEDES-BENZ GROUP AG, a German corporation, | |
| Defendant. | |

1.     Plaintiff David Chappell ("Plaintiff") brings this action individually and on behalf of all persons in Nevada and the United States who purchased or leased any model year 2021-present S580 Sedan vehicles equipped with 21" AMG V-multispoke wheel configuration ("Class Vehicles") marketed, distributed, sold, warranted, and/or serviced by Mercedes-Benz USA, LLC ("MBUSA") and designed and manufactured by Mercedes-Group AG ("MBAG") (collectively, "Mercedes" or "Defendant") ("Class Vehicles").  Plaintiff alleges as follows:

### INTRODUCTION

2.     This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.     Mercedes designed, manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles' wheels were defective.

1

4.     The Class Vehicles are defective in that they are equipped with wheels and tires ("Wheel Configuration") that cause sudden and repeated tire blowouts, tire punctures, sidewall bubbling, tire deflation, and cracked rims that necessitate costly repairs and replacements (the "Wheel Configuration Defect"). The 21" Wheel Configuration in use on the Class Vehicles is insufficient to withstand the weight of such vehicles, which results in the failure of its structural integrity, which inexorably leads to the tire and wheel degradation described above.

5.     The Wheel Configuration Defect is inherent in each Class Vehicle and was present at the time of sale.

6.     Mercedes knew of the Wheel Configuration Defect through pre-production testing, pre-production design failure mode analysis, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, consumer complaints to dealers and on online forums, and testing performed in response to consumer complaints.  However, this knowledge and information was exclusively in the possession of Mercedes and its network of dealers and, therefore, unavailable to consumers.

7.     Despite access to aggregate internal data, Mercedes has actively concealed the existence of the defect, telling customers, as cited below, that the wheels and/or tires are not defective and that the blowouts are caused by potholes or other driver error, without any such evidence to support external causes.

8.     Mercedes sells the Class Vehicles with a 4-year, 50,000-mile New Vehicle Limited Warranty, and the tires supplied on the Class Vehicles are covered

by a 1-year, 12,000-mile warranty.[1] However, when class members bring their vehicles to Mercedes's authorized dealerships requesting coverage for the Wheel Configuration Defect, Mercedes is systematically denying coverage. As a result, Class Members are paying thousands of dollars out-of-pocket to repair, and if they purchase the replacements from Mercedes, to replace the wheels and/or tires with equally defective wheels and/or tires. Additionally, class members rely on the warranty and, in compliance with such warranty, must request tire warranty claims at an Authorized Mercedes-Benz Dealership or risk voiding the warranty for submitting any claims or repairs anywhere else contrary to the requirements of the warranty.[2]

9.      Precursor models to the Class Vehicles in years prior to the 2021 model year, such as in Mercedes-Maybach S Class models, were equipped with Wheel Configurations that were appropriate for the vehicle and were sufficient to prevent damage from potholes and/or other road surface flaws. Therefore, Mercedes was aware that a different Wheel Configuration was needed to protect against the Wheel Configuration Defect.

10.     The Wheel Configuration Defect is material because it poses a serious safety concern. As attested by Class Members in complaints on the National Highway Traffic Safety Administration ("NHTSA")'s website, online forums, and to Mercedes authorized dealers, the Wheel Configuration Defect can impair any driver's ability to control his or her vehicle and greatly increase the risk of collision, including causing tire blowouts.

---

[1]      Mercedes-Benz, *Service and Warranty Information 2023*, https://www.mbusa.com/content/dam/mb-nafta/us/owners/manuals/2023/2023-warranty-booklet.pdf (last viewed April 24, 2024).

[2] Mercedes-Benz, *supra* footnote 1 at 13 ("To make a warranty claim you must present your vehicle to an Authorized Mercedes-Benz Dealership…")

11.     The Wheel Configuration Defect is also material because consumers will incur significant and unexpected repair costs that could reach upwards of $3,000.00 to replace damaged wheels and tires. Mercedes's failure to disclose, at the time of purchase or lease, the Wheel Configuration Defect is material because no reasonable consumer expects to spend thousands of dollars to repair or replace wheels and tires.

12.     Had Mercedes disclosed the Wheel Configuration Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles on the same terms or would have paid less for them.  As a result of Defendant's omissions concerning the defective nature of the Class Vehicles, Plaintiff and the other Class Members paid more for their vehicles than they otherwise would have, and therefore suffered a loss of money and/or loss in value of their Class Vehicles.

**THE PARTIES**

**<u>Plaintiff David Chappell</u>**

13.     Plaintiff is a Nevada resident who resides in Las Vegas, Nevada

14.     On or around July 25, 2023, Plaintiff purchased a new 2023 Mercedes-Benz S580 4MATIC from Fletcher Jones Imports, an authorized Mercedes dealer in Las Vegas, Nevada.

15.     Plaintiff purchased his vehicle primarily for personal, family, or household use.

16.     Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff researched the Mercedes-Benz S580 4MATIC with 21" wheels online, including on the Mercedes website and on the dealership website. At the dealership, Plaintiff also reviewed the vehicle's Monroney Sticker or "window sticker" which listed official

information about the vehicle, and test drove the vehicle with a salesperson. One dealership employee, Sales Consultant Thomas Bucca, confirmed that the Mercedes-Benz S580 4MATIC with 21" wheels would be great for traveling long distances, as Plaintiff and his wife were planning a cross-country trip and told this to the employee. None of these sources made reference to the Wheel Configuration Defect. Plaintiff believed that the vehicle would be a safe and reliable vehicle.

17.    Mercedes's omissions were material to Plaintiff. Had Mercedes disclosed its knowledge of the Wheel Configuration Defect before he purchased his vehicle, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Configuration Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

18.    Within seven months of purchasing his vehicle, on or around January 17, 2024, with approximately 7,313 miles on the odometer, the front driver's side tire of Plaintiff's vehicle blew out while he was driving through New Mexico, during a road trip from Las Vegas, Nevada to Florida.

19.    Plaintiff and his wife called Mercedes-Benz Roadside Assistance, who could not pick them up until the next day. They were forced to stay at a hotel overnight, and on the next day, on or around January 18, 2024, they were driven approximately three (3) hours by tow truck to the nearest Mercedes dealership, Mercedes-Benz of Lubbock located in Lubbock, Texas.

20.    The dealership personnel at Mercedes-Benz of Lubbock found that the "[t]ire has a hole in the side wall 0.50" and they "[r]emoved wheel. Removed and replaced tire. Adjusted ALL tire pressures. Reset tire pressure light." Plaintiff paid a total of approximately $499.30, including parts and labor, for this repair, as the Mercedes dealer refused to cover it under warranty.

21.    On or around January 22, 2024, Plaintiff experienced a second tire blowout on the front driver's side.  A tow truck dropped Plaintiff off at Mercedes-Benz of Nashville in Franklin, Tennessee, where they dropped off the vehicle and spent the night in a hotel with his wife. The next morning, a Mercedes Service Advisor told Plaintiff that Mercedes was running low on the tires needed for Plaintiff's vehicle due to the number of blowouts, and recommended that he buy an extra one. The Service Advisor also looked for a tire with a larger sidewall, but such a tire was unavailable.  The Service Advisor further told Plaintiff that the Mercedes-authorized dealer salesperson should never have sold Plaintiff the vehicle with 21" rims knowing that he was going across the country. The dealership charged Plaintiff a total of $1,031.70 for the tire replacement and extra tire.

22.    Neither one of Plaintiff's tire repairs/replacements were covered under warranty, despite the fact that the vehicle was less than seven months old.

23.    Despite bringing his vehicle to the Mercedes dealerships—Mercedes's authorized agent for repairs—Plaintiff has not received a repair under warranty, and his vehicle continues to exhibit the Wheel Configuration Defect because the vehicle is not equipped with appropriate tires to prevent the Wheel Configuration Defect from again resulting in tire blowouts.

Indeed, Plaintiff has now garaged his Class Vehicle in light of the unrepaired defect and associated safety concerns.

24.    At all times, Plaintiff, like all Class Members, has attempted to drive his vehicle in a manner both foreseeable and in which it was intended to be used.

**<u>Defendants</u>**

25.    Defendant MBUSA is a corporation organized and in existence under the laws of the State of New Jersey, headquartered in the State of Georgia, and

registered to do business in the State of Nevada. Founded in 1965, MBUSA is a North American subsidiary of MBAG. Discovery will show that at all relevant times herein, MBUSA was engaged in the business of marketing, distributing, servicing, and selling Mercedes branded automobiles and other motor vehicles and motor vehicle components in Nevada and throughout the United States of America. MBUSA also distributes all technical materials drafted by MBAG intended to be used by authorized dealerships in the service and repair of Mercedes branded vehicles. MBUSA also oversees certain automobile product design and market research functions into its regional operations. MBUSA drafts and is responsible for providing the Monroney stickers on Mercedes vehicles, but does so with information provided by MBAG. MBAG has designated MBUSA as its representative to interact with the National Highway Traffic Safety Administration and to fulfill its duties as a manufacturer under federal law.

26.    Defendant MBAG (formerly known as Daimler AG) is a German multinational automotive corporation founded under the laws of Germany and headquartered in Stuttgart, Baden-Württemberg, Germany. MB AG designs, manufacturers, and distributes automobiles, as well as parts for Mercedes and Maybach branded vehicles, and is the parent company of MBUSA and all other Mercedes-branded corporations. Discovery will show that the design and manufacture of Class Vehicles, including their component systems and any repairs or service necessary, is the primary focus of MBAG. MBAG also drafts all technical materials to be distributed by MBUSA for the service and repair of Mercedes vehicles. Discovery will show that the agreements which govern the relationship between MBAG and MBUSA give MBAG substantial control over the business operations of MBUSA, particularly with regards to the communications

MBUSA distributes on MBAG's behalf.

27.    At all relevant times, MBAG and MBUSA were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components in Nevada, Georgia, and throughout the United States of America.

## JURISDICTION

28.    This is a class action.

29.    Members of the proposed Class are citizens of states different from the home state of Defendant.

30.    The aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

31.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

32.    MBUSA and MBAG, through their business of distributing, selling, and leasing the Class Vehicles, have established sufficient contacts in this district such that personal jurisdiction is appropriate. MBUSA and MBAG are deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

33.    Further, MBUSA maintains its U.S. corporate headquarters in Atlanta, Georgia such that personal jurisdiction is appropriate under 28 U.S.C. § 1391, and is deemed to reside in this district pursuant to 28 U.S.C. § 1391 (d) because its corporate headquarters are in this district.

## FACTUAL ALLEGATIONS

34.    Since the summer of 2021, if not earlier, Mercedes has designed, manufactured, distributed, sold, and/or leased the Class Vehicles.  Mercedes has sold, directly or indirectly, through dealers and other retail outlets, thousands of

Class Vehicles in Nevada and nationwide. Mercedes warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

35.    Unbeknownst to purchasers, the Class Vehicles are defective in that they are equipped with wheels and tires that cause sudden and repeated tire blowouts,  tire punctures, sidewall bubbling, tire deflation, and cracked rims that necessitate costly repairs and replacements. The 21" Wheel Configuration in use on the Class Vehicles is insufficient to withstand the weight of such vehicles, which results in the failure of its structural integrity, which inexorably leads to the tire and wheel degradation described above. The Wheel Configuration Defect is inherent in each Class Vehicle and was present at the time of sale.



Fig. 1: S580 AMG with 21-inch AMG V-multispoke wheel configuration

36.    Mercedes knew of the Wheel Configuration Defect through pre-production testing, pre-production design failure mode analysis, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, consumer complaints to dealers and in online forums, and testing performed in response to consumer complaints.  However, this knowledge and information was exclusively in the possession of Mercedes and its network of dealers and, therefore, unavailable to consumers.

37.    The Wheel Configuration Defect is material because it poses a serious safety concern. As attested by Class Members in complaints in online forums and to Mercedes authorized dealers, the Wheel Configuration Defect can impair any driver's ability to control his or her vehicle and greatly increase the risk of collision, including causing tire blowouts.

38.    The Wheel Configuration Defect is dangerous, causing tire blowouts, tire punctures, sidewall bubbling, tire deflation, and cracked rims that can lead to a sudden loss of control at speed and a potential collision.

39.    Plaintiff has had the unnerving experience of trying to regain control of his vehicle when his tires blew out twice, once while exiting the freeway and once while driving on the freeway.

**Mercedes Had Superior and Exclusive Knowledge of the Wheel Configuration Defect**

40.    Since 2021, if not earlier, Mercedes has designed, manufactured, distributed, sold, and/or leased the Class Vehicles. However, prior to 2021, Mercedes distributed, sold, and/or leased the precursors to the Class Vehicles,

which unlike the Class Vehicles, were equipped with wheel configurations that were appropriate for the vehicle and were sufficient to prevent damage from potholes and/or other road surface flaws.

**Complaints Lodged with NHTSA**

41.    Mercedes also monitors customers' complaints made to NHTSA. Federal law requires automakers like Mercedes to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See Transportation Recall Enhancement Accountability and Documentation "TREAD" Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

42.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. Id. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. Id. Thus, Mercedes knew or should have known of the many complaints about the Wheel Configuration Defect logged by NHTSA's Office of Defects Investigation ("ODI"), and the content, consistency, and large number of those complaints alerted, or should have alerted, Mercedes to the Wheel Configuration Defect.

43.    For years, owners of S580 Sedan vehicles equipped with the 21" AMG wheel configuration have publicly complained to the United States government about the Wheel Configuration Defect in Class Vehicles. The ODI is an office within NHTSA. ODI conducts defect investigations and administers safety recalls supporting the NHTSA's mission to improve safety on the Nation's highways. All

automobile manufacturers routinely monitor and analyze NHTSA complaints because this information is used in determining if a recall should be issued. Indeed, automobile manufacturers are required by law to report any potential safety defects to the United States government.

44.    The following complaints regarding the Class Vehicles made to NHTSA demonstrate that the defect is widespread and dangerous and that it manifests without warning. The complaints also indicate Mercedes's awareness of the problems with the tires, wheels, and Wheel Configuration Defect, including how dangerous they are for drivers. These safety complaints relate to the Wheel Configuration Defect:

> DATE OF INCIDENT: October 14, 2021
> DATE COMPLAINT FILED: July 28, 2022
> NHTSA ID NUMBER: 11476303
> SUMMARY: THE CONTACT OWNS A 2021 MERCEDES-BENZ S580 EQUIPPED WITH PIRELLI TIRES, TIRE LINE: P ZERO MO-S, TIRE SIZE: P255/35/R21 (FRONT TIRES) AND P285/30/R21 (REAR TIRES), DOT NUMBER: (UNAVAILABLE). THE CONTACT STATED WHILE DRIVING 30 MPH, THE DROVE OVER A POTHOLE AND THE DRIVER'S SIDE FRONT TIRE EXPERIENCED A BLOWOUT. THE VEHICLE WAS TOWED TO THE DEALER, AND THE CONTACT WAS INFORMED THAT THERE WAS A BUBBLE ON THE SIDE SHOULDER OF THE TIRE, AND THE TIRE NEEDED TO BE REPLACED. THE TIRE WAS REPLACED. THE CONTACT STATED THAT A SIMILAR FAILURE REOCCURRED WITH THE FRONT PASSENGER'S SIDE TIRE AND THE REAR DRIVER'S SIDE TIRE. THE VEHICLE WAS TAKEN TO THE DEALER BOTH TIMES AND THE CONTACT WAS INFORMED THAT THE SIDEWALLS ON THE TIRES WERE THIN CAUSING THE BLOWOUTS. THE FAILURE MILEAGE WAS 3,000.
>
> DATE OF INCIDENT: June 9, 2023
> DATE COMPLAINT FILED: June 12, 2023
> NHTSA ID NUMBER: 11526539

SUMMARY: I HAVE HAD ONE TIRE BLOW OUT AFTER TRAVELING OVER A MODERATE POT HOLE, AND 3 OTHER TIRES THAT HAVE BEEN DAMAGED WITH "BUBBLES" DUE TO EXCESSIVE STRESS FROM NORMAL DRIVING. IN ADDITION TO THE DAMAGED TIRES, I HAVE HAD 3 BENT WHEELS ALL DUE TO NORMAL DRIVING BECAUSE THE 21 INCH WHEELS/TIRES ON THIS VEHICLE CANNOT TOLERATE THE LOADS DURING NORMAL DRIVING. THIS IS A WELL-KNOWN DEFECT BY MERCEDES AND I BELIEVE IT IS A DESIGN DEFECT AND THAT IT IS DANGEROUS.

DATE OF INCIDENT: January 4, 2022
DATE COMPLAINT FILED: July 6, 2022
NHTSA ID NUMBER: 11475880
SUMMARY: I HAVE HAD 3 TIRE FAILURES(BLOWOUTS)WHEN I HAVE HIT POTHOLES WITH MY 21" WHEELS AND PIRELLI P ZERO TIRES. I READ ON A MBZ FORUM FOR MY SPECIFIC MAKE OF CAR - 2021/2022 MBZ S580 - THAT MANY OTHERS HAVE EXPERIENCED THE SAME FAILURES WITH THESE PIRELLI TIRES. THOSE THAT HAVE MICHELIN HAVE HAD NONE. WITH SUCH A SMALL AREA BETWEEN THE ROAD AND THE RIM AFFORDED BY SUPER LOW PROFILE 21" SETUPS, A TIRE LIKE PIRELLI WITH A WEAK SIDEWALL WILL FAIL WHEN THE CAR STRIKES A POTHOLE OR OBSTRUCTION. ANOTHER OWNER ON THE FORUM SAID WHEN HE CONTACTED MERCEDES, THEY SAID IT WAS NOT THEIR PROBLEM, BUT PIRELLI'S. MEANWHILE, THERE ARE THOUSANDS OF OWNERS WITH THIS COMBINATION, MANY OF WHICH HAVE ALREADY EXPERIENCED FAILURES. SOMETHING NEEDS TO BE DONE BEFORE THERE ARE INJURIES, OR WORSE.

DATE OF INCIDENT: September 2, 2023
DATE COMPLAINT FILED: September 7, 2023
NHTSA ID NUMBER: 11543197
SUMMARY: 1. THE TIRES//RIMS ON THIS VEHICLE ARE CAUSING EXTREMELY EXCESSIVE TIRE BLOWOUTS. I HAVE HAD AT LEAST 5 TIRE BLOWOUTS IN THE LAST 6 MONTHS ALONE ALONG WITH 8-10 TIRE CHANGES DUE TO BUBBLE FORMING ON SIDEWALL. THIS IS A WIDESPREAD ISSUE ON THIS VEHICLE IN WHICH I HAVE READ THAT MANY OTHERS ARE ALSO EXPERIENCING THE SAME.

THE VEHICLE IS AVAILABLE FOR INSPECTION. 2. A TIRE
BLOWOUT WHILE DRIVING CAN BE EXTREMELY HAZARDOUS
ESPECIALLY ON THE FREEWAY. 3. THE PROBLEM WITH THIS
VEHICLE HAS BEEN CONFIRMED WITH THE DEALER. HOWEVER,
THEY ARE UNABLE TO PINPOINT WHAT IS EXACTLY CAUSING
THESE EXCESSIVE TIRE BLOWOUTS. 4. NO, THE VEHICLE HAS
NOT BEEN INSPECTED. 5. NO WARNINGS PRIOR TO INCIDENTS.

DATE OF INCIDENT: July 9, 2022
DATE COMPLAINT FILED: July 27, 2022
NHTSA ID NUMBER: 11476102
SUMMARY: I AM AN OWNER OF A 2022 MERCEDES BENZ. THE CAR
IS EQUIPPED WITH OPTIONAL 21" AMG WHEELS PAIRED WITH
PIRELLI P ZERO MO-S (MERCEDES ORIGINAL EQUIPMENT) TIRES.
P255/35R21 FRONT AND P285/30R21 REAR. WITH ONLY 490 MILES
ON THE ODOMETER I EXPERIENCED A CATASTROPHIC FAILURE
OF THE FRONT PASSENGER-SIDE TIRE AFTER GOING OVER WHAT
SEEMED TO BE AN INSIGNIFICANT POTHOLE. WHILE AT THE
SERVICING DEALER I NOTICED SAME CAR AS MINE WITH 21"
WHEELS WITH A BLOWN FRONT DRIVER-SIDE TIRE AND
DESTROYED RIM, I EVEN TOOK A PICTURE OF IT. MY SERVICE
ADVISOR CONFIRMED THAT THIS IS A VERY COMMON ISSUE
THAT THEY SEE AT LEAST ONCE OR TWICE A MONTH. THAT'S IN
A CITY WITH MAYBE A 100 OF THESE CARS IN TOTAL. "THIS
SHOULD BE A CLASS ACTION LAWSUIT" WERE HIS EXACT
WORDS. I HAD TO WAIT OVER A WEEK TO GET THE CAR BACK AS
THERE IS A NATIONWIDE SHORTAGE OF THIS PARTICULAR TIRE.
MY SERVICE ADVISOR AGREED THAT THIS ALSO POINTS TO A
HIGHER THAN NORMAL RATE OF FAILURES THAT CREATES THIS
SHORTAGE. I AM AN ACTIVE MEMBER OF THE MBWORLD.ORG
FORUMS WHERE MERCEDES OWNERS COME TO DISCUSS THEIR
VEHICLES. THERE ARE MULTIPLE THREADS ABOUT THIS VERY
TIRE AND A NUMBER OF OWNERS THAT EXPERIENCED MULTIPLE
FAILURES, SOME AS MANY AS THREE TIMES. IT IS COMMON TO
HAVE BOTH THE FRONT AND THE REAR TIRE FAIL AFTER GOING
OVER THE SAME POTHOLE, OR IN SOME INSTANCES THE FRONT
TIRE FAILED WHILE THE REAR DEVELOPED A BUBBLE AND
NEEDED TO BE REPLACED AS WELL. THE ONLY SOLUTION THAT

PEOPLE FOUND WAS TO REPLACE PIRELLI TIRES WITH MICHELIN PILOT 4S TIRES IN THE SAME SIZE. I ESCALATED THIS CASE TO MERCEDES-BENZ CUSTOMER ADVOCACY AND AFTER SEVERAL DAYS WAS INFORMED THAT MERCEDES IS NOT ACCEPTING RESPONSIBILITY FOR THIS FAULTY EQUIPMENT AND ADVISED TO SEEK RESOLUTION WITH PIRELLI. THIS IS CLEARLY UNACCEPTABLE AND IS NOT A MATTER OF EXPENSES OR INCONVENIENCE. THIS IS A HUGE SAFETY RISK AS THESE TIRES SEEM TO BE EITHER DEFECTIVE OR UNSUITABLE FOR SUCH A HEAVY VEHICLE. AT HIGH SPEEDS THIS COULD LEAD TO FATAL ACCIDENTS.

DATE OF INCIDENT: December 19, 2021
DATE COMPLAINT FILED: February 4, 2022
NHTSA ID NUMBER: 11450397
SUMMARY: THE CONTACT OWNS A 2022 MERCEDES-BENZ S500. THE CONTACT RECEIVED A NOTIFICATION FOR NHTSA CAMPAIGN NUMBER: 21V00J000 (ELECTRICAL SYSTEM, COMMUNICATION) HOWEVER, THE PARTS FOR THE REPAIR WERE UNAVAILABLE. THE DEALER HAD BEEN NOTIFIED ABOUT THE RECALL AND CONFIRMED THAT PARTS WERE NOT YET AVAILABLE. THE MANUFACTURER HAD BEEN NOTIFIED OF THE RECALL. THE CONTACT STATED THAT THE MANUFACTURER HAD EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE REPAIR. THE CONTACT ALSO MENTIONED THAT HE EXPERIENCED A BLOWOUT FAILURE WITH THE PASSENGER'S SIDE FRONT PIRELLI PZERO TIRE, TIRE SIZE: 255/35/R21, DOT NUMBER: 1UN13874K. THE CONTACT STATED THAT HE REPLACED THE TIRE WITH THE SPARE; HOWEVER, THE VEHICLE WAS NOT TAKEN TO AN INDEPENDENT MECHANIC OR DEALER. THE CONTACT STATED THAT APPROXIMATELY A WEEK LATER, THE DRIVER'S SIDE TIRE EXPERIENCED THE SAME BLOWOUT FAILURE AND WAS TAKEN TO AN INDEPENDENT MECHANIC. THE CONTACT STATED THAT THE DRIVER'S TIRE HAD THE SAME TIRE INFORMATION AS THE FRONT PASSENGER'S SIDE TIRE. THE MECHANIC INFORMED HIM THAT THERE WERE BUBBLES FORMED ON THE REAR PASSENGER'S SIDE TIRE; TIRE SIZE: 255/30/R21, DOT NUMBER: IXTY8464L. THE MECHANIC

SUGGESTED THAT ALL THE TIRES BE REPLACED. THE TIRE AND VEHICLE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE TIRE FAILURE MILEAGE WAS APPROXIMATELY 2,000. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

DATE OF INCIDENT: May 14, 2023
DATE COMPLAINT FILED: June 16, 2023
NHTSA ID NUMBER: 11527388
SUMMARY: 2ND ISSUE WITH OBJECTS IN TIRE AND LOSING AIR. THERE ARE KNOWN ISSUES WITH THIS NEW MODEL AND THE COMBINATION OF THE 21"RIM, NEW MODEL SERIES, AND PIRELLI TIRE. ADDITIONAL CONSUMER ISSUES CAN BE FOUND AT: HTTPS://MBWORLD.ORG/FORUMS/S-CLASS-W223/845213-THOSE-EXPERIENCED-TIRE-BLOWOUTS-21N-PIRELLIS.HTML

**Customer Complaints on Third-Party Websites**

45.    Complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Mercedes's awareness of the problems with the 21" wheel configuration and how potentially dangerous the defect is for consumers. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

a.   **July 10, 2022:** Seems like the two things consistent in these "pothole: failures are Pirelli tires and 21" wheels. As I've written before, I've had 3 failures with my Pirellis on my S580 - at $500 a pop- and from what I read, almost all failures are with the Pirelli P-Zeros. In my opinion, and others I've read in this Forum, these tires have a weaker sidewall than others. (note. As I previously mentioned, I spent 31 years in the tire business) A weak sidewall coupled with the reduced distance between tire and road because of the 21" super low profile setup is a recipe for disaster when you hit a pothole. my recommendation: stay away from the

21" option and, for sure, opt for some tire OTHER than Pirelli. (*Available at* https://mbworld.org/forums/s-class-w223/845081-stranded-blown-tire.html)

b. **July 11, 2022** (from the same user as the above post)**:** UPDATE: Got contacted by a service advisor from the dealership where the car was dropped off as soon as the dealership opened this morning. The ETA on new tire is next Monday, 07/18, which is actually much better than what I was expecting based on previous reports from the forum members. Asked him to check out the rear tire for any bubbles, since it went over the same pothole. Also gave him my small laundry list of issues I've been experiencing. They will flash the latest software updates to see if they resolve the "glitches" with ECM and malfunctioning driver assistance programs as well as rough transmission shifts and auto engine shut-off restarts. He did say that this is far from the first Pirelli blowout that he's seeing, said I was smart for getting the rim/tire hazard insurance and said Mercedes isn't doing or planning to do anything about these POS Pirellis. My appointment was originally booked for service on Thursday with a loaner reservation but he's trying to find me one sooner. Also talked to the guy that sold me the car (dealer in California). He actually drives an identical S580 (but MY'21) and ordered mine to match his spec for the dealer inventory. He was the one that insisted I get rim/tire insurance, so I thanked him for it. He just told me that he went through 9 tires in 3 months until he started asking his dealership to replace them with Michelins and eventually got all 4 replaced. Hasn't had any blowouts since then. So basically, he confirmed what we all already know.

Michelins = great, Pirellis = suck. His '21 was also experiencing a lot of software malfunctions that eventually went away with software updates. (*Id.*)

c. **July 11, 2022:** So it seems like Pirelli has had an unacceptable failure rate on S580's with 21" wheels. (I've had 3) Is there any way,or anybody, that can be contacted at Mercedes Corporate to let them know that Pirelli is not an acceptable tire for this car. Or at least find out if they are aware of and acknowledge the problem. I don't think they hear about these through their dealer network. I'm not expecting reimbursement for the $1500 I've paid to replace my three, but MBZ needs to be aware of that they are equipping their luxury brand with a substandard product. Heck, if I knew who to write, or call, I'll do it myself. (*Id.*)

d. **January 14, 2023**: I just had a sidewall blow on my 21" Pirelli tire. I have not had a tire failure in 30+ years. I am not happy as it damaged my wheel too. Mercedes needs to change tire suppliers. (*Available at* https://mbworld.org/forums/s-class-w223/845213-those-experienced-tire-blowouts-21n-pirellis.html).

e. **July 15, 2023**: After last night and it being my 9th tire change this is a clear issue of low profile tires, heavy car, and bad quality tires. I barely even hit a pothole and the run flat does not work. If anyone can reach out to me that would be great. Ive been lucky enough to get the tire and wheel insurance policy but god forbid if I did not I would have blown through a LOT of money. (*Id.*)

f. **July 29, 2022:** I bought this car about 2 months ago and driven for less then 3000 miles I had tire blown up twice on two occasions I am

wondering if it is a coincidence or others had the same problem (*Available at* https://www.benzforum.com/threads/2022-s580-with-21-inches-wheels.37733/)

g. **March 16, 2023** (in the same thread as the above post): not a coincidence at all. All of us with S580 with 21 inch wheels have serious recurring problems. (*Id.*)

h. **June 11, 2023:** I have a 2021 S580 with the 21 inch wheels. I have had 3 bent rims and 5 blown tires. I may be pursuing a Lemon Law action at this point. (*Id.*)

i. **September 2, 2023:** I have had at least 10-15 tire changes in the last 8 months alone. (2022 S580). Complete nightmare. (*Id.*)

j. **September 4, 2023:** I contacted MBUSA about three months regarding a buyback but they denied my request. I explained to them that I believe the rims//tires are not correctly engineered for this vehicle and are most likely the reason for the extremely excessive number of tire blowouts. I'm not sure what to do at this point—the car has been in the shop longer than I've actually driven it. To make matters worst; I'm left without a car since the dealership rarely has a loaner available and they never have the tires in stock. Stuck having to use Uber all day while I'm paying $2k a month of this car. (*Id.*)

k. **September 21, 2023:** well known problem. I believe the only other vehicle with these tires are the Maserati. They have same issue. I've had 3 tires go in 1 month. It's insane that these are not run-flats at least. Very dangerous. (*Id.*)

l. **November 24, 2023:** Has any one else had luck with a buyback? I am

scared to even drive this $130,000 piece of junk because the tires have left me stranded several times. Thanksgiving night last night in a dangerous part of New Orleans. 4 blowouts in 6 months. Absurd. And these idiots did not put run flats on the 21 AMG wheels. (*Id.*)

m. **December 28, 2023:** Hello, having the same problems. 5 replacement tires, 1 rims replacement 1 rim repair (2022 S580 10K miles). Had the car for about 15 months. Car still not driving like it original did. road noise on the front passenger side. they think I have a ball barrier issue on the front from my last blowout. Its getting so ridiculous I have to go thru so much for a 140K car. I'm scared to take the car on a road trip, I may get stranded for days. I should have stayed with Toyota. [emojis] I'm going to talk to customer care and see what happens. SO DISAPPOINTED IN THIS LUXURY CAR. (*Id.*)

n. **January 3, 2024:** I have s580 year 2023 with 10000 miles, replaced 11 tires just because I drove over a little pot hole; I contacted Mercedes they stated that nothing wrong with suspension or rims it is all about the low performance tires and it is normal for 21 inches rims as they have a narrow side wall and the only way to recommend is to talk to the dealer to replace / switch to different tires size on my expense. (*Id.*)

o. **March 18, 2024:** bought a New S580 July 2022. Had a blow out on interstate 100 miles from home. Guess what no spare or Jack. Only choice was to have it towed to dealership and have someone pick us up. New tire new front in alignment 1800 later. Two weeks later in another city same thing. Car is towed and here I go again. This is crazy (*Id.*)

46.    Mercedes had superior and exclusive knowledge of the Wheel

Configuration Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the Class Vehicles.

47.    Plaintiff is informed and believes, and based thereon alleges, that before Plaintiff purchased his Class Vehicles, and since 2021, Mercedes knew about the Wheel Configuration Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Mercedes and its dealers, testing conducted in response to those consumer complaints, high failure rates, and other aggregate data from Mercedes dealers about the problem. Additionally, through its authorized dealerships, Mercedes interacted with Class Members directly and responded to complaints regarding the Wheel Configuration Defect.

48.    Mercedes is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Mercedes conducts tests, including pre-sale durability testing, on incoming components, including the wheel and tire, to verify the parts are free from defect and align with Mercedes's specifications.[3] Thus, Mercedes knew or should have known the wheel and tire configurations were defective and prone to put drivers in a dangerous position due to the inherent risk of the Wheel Configuration Defect.

49.    Additionally, Defendant should have learned of this widespread defect from the sheer number of reports received from dealerships. Mercedes's customer relations department, which interacts with individual dealerships to identify

---

[3]   Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed April 24, 2024).

potential common defects, has received numerous reports regarding the Wheel Configuration Defect, which, on information and belief, led Mercedes to direct repair tips and suggestions to its technicians. Consumers' online posts, a sample of which are set forth above, indicate that these do not remedy the defect. Mercedes's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

50.    Further, Defendant should have learned of this widespread defect from the sheer number and cost of tire and wheel replacements for the Class Vehicles.

51.    Defendant's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendant's policy that when a repair is requested under warranty the dealership must provide Mercedes with detailed documentation of the problem and a complete disclosure of the repairs required to correct it. Dealerships have an incentive to provide detailed information to Defendant, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

52.    The existence of the Wheel Configuration Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiff and other Class Members known of the Wheel Configuration Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

53.    Reasonable consumers, like Plaintiff, expect that a vehicle's wheels and tires are safe, will function in a manner that will not pose a safety risk, and are free from defects. Plaintiff and Class Members further reasonably expect that

Mercedes will not sell or lease vehicles with known safety defects, such as the Wheel Configuration Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Mercedes to conceal and fail to disclose the Wheel Configuration Defect to them, and to then continually deny its existence.

### Mercedes Has Actively Concealed the Wheel Configuration Defect

54.   Despite its knowledge of the Wheel Configuration Defect in the Class Vehicles, Mercedes actively concealed the existence and nature of the defect from Plaintiff and Class Members. Defendant has acted or refused to act on grounds that apply generally to the Class or Subclasses. Specifically, Mercedes failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)   any and all known material defects or material nonconformity of the Class Vehicles, including the Wheel Configuration Defect;

(b)   that the Class Vehicles, including the wheels and tires, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)   that the Class Vehicles and their wheels and tires were defective, despite the fact that Mercedes learned of such defects as early as 2021.

55.   When consumers present their Class Vehicles to an authorized Mercedes dealer for repairs, rather than repair the problem under warranty, Mercedes dealers either inform consumers that the failure is the consumers' fault, was caused by outside influence, directs them to consumers' insurance company, or conduct repairs that merely mask the Wheel Configuration Defect.

### Mercedes Has Unjustly Retained A Substantial Benefit

23

56.     Defendant unlawfully failed to disclose the alleged defect to induce Plaintiff and other putative Class Members to purchase or lease the Class Vehicles.

57.     Plaintiff further allege that Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiff's purchase of his vehicle.

58.     Defendant unlawfully induced Plaintiff to purchase his Class Vehicle by concealing a material fact (the Wheel Configuration Defect). Plaintiff would have paid less for the Class Vehicle, or not purchased it at all, had he known of the defect.

59.     Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did —and likely will continue to—deceive consumers, should be disgorged.

### The Agency Relationship regarding the Vehicle Warranties Between Defendant and its Authorized Dealers

60.     In order to sell vehicles to the general public, Defendant enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiff while also advertising the warranties provided by Mercedes directly to consumers when they purchase a Mercedes-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in Mercedes's stead to provide repairs under the warranties Mercedes provides directly to consumers. Accordingly, discovery will show, particularly the dealership agreements between MBUSA and third-party dealerships, that Defendant has authorized these dealerships to be its agents for the purposes of warranty repairs, including diagnosis of whether warranty repairs are required, and as such, the consumers are third-party beneficiaries of these dealership

agreements because they benefit from being able to purchase and receive warranty repairs locally. Discovery will show that because Plaintiff and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by these authorized dealerships, they may avail themselves of the implied warranty against Defendant. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

61.     Further, Plaintiff and each of the members of the Class are the intended beneficiaries of the express and implied warranties which accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Mercedes. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

62.     Mercedes issued the express warranty to Plaintiff and the Class members. Mercedes also developed and disseminated the owner's manuals and warranty booklets which direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. Mercedes also developed and disseminated the advertisements such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles and promoting the terms of the warranties that they issue with the sale of each Class Vehicle. Mercedes is also responsible for the content of the Monroney Stickers on its vehicles. Because

Mercedes issues the express warranties directly to the consumers, the consumers are in direct privity with Mercedes with respect to the warranties.

63.   In promoting, selling, and repairing their defective vehicles, Defendant acts through numerous authorized dealers who act as, and represent themselves to the public as exclusive Mercedes representatives and agents, particularly for the purpose of providing repairs that are the responsibility of Mercedes to provide under its warranties. That the dealers act as Defendant's agents for this purpose is demonstrated by the following facts:

(a)   The authorized dealerships complete all service and repair according to instructions disseminated directly to them by Mercedes, including service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents drafted by Mercedes;

(b)   Technicians at Defendant's dealerships are required to go to at least yearly Mercedes-given trainings in order to remain certified to work on Mercedes-branded vehicles, at which they receive training on proprietary systems, which provides guided, step-by-step instructions on diagnosing and repairing Mercedes-branded vehicles;

(c)   Consumers are able to receive services under Mercedes's issued New Vehicle Limited Warranties only at authorized dealerships, and they are able to receive these services because of the agreements between Mercedes and the authorized dealers. These agreements provide Mercedes with a significant amount of control over the actions of the authorized dealerships;

(d)   The warranties provided by Mercedes for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)   Mercedes controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Mercedes's authorization;

(f)   Mercedes has entered into agreements and understandings with their authorized dealers pursuant to which they authorize and exercise substantial control over the operations of their dealers and the dealers' interaction with the public, particularly the advertising of the Class Vehicles, specifically the terms and conditions of the express warranties, as well as how consumers may avail themselves of the remedies under those express warranties; and

64.   Indeed, Mercedes' warranty booklet makes it abundantly clear that only its authorized dealerships are its agents for warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, the Mercedes vehicle must be taken to a Mercedes dealership for a warranted repair during the warranty period.

65.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant for the purposes of the warranties, which are direct contracts between Mercedes and the purchasers of their branded vehicles. Plaintiff and each of the members of the Class have had sufficient direct dealings with either Mercedes or their agent dealerships to establish privity of contract

between Mercedes, on one hand, and Plaintiff and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiff and Defendant. It also establishes that Plaintiff was dealing with Defendant through their authorized agent dealerships when they were given the New Vehicle Limited Warranty associated with their vehicles, without any ability to negotiate the terms of that Warranty.

**Defendant's Warranties were Unconscionable**

66.     Plaintiff signed contracts for sale with Defendant's authorized dealers, and with that sale, were presented with a separate Warranty as drafted by Mercedes. While Plaintiff and class members have some ability to negotiate price of the vehicle, they have no ability to negotiate the terms of the Warranty. Plaintiff had no bargaining power with respect to the Warranty, was presented with it as a *fait accompli*, and had to accept it in the exact form in which it was presented to him, which occurred after the vehicle purchase transaction was completed. Plaintiff had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored Mercedes over Plaintiff and the members of the Class; a gross disparity in bargaining power existed as between Mercedes and Class members; and Mercedes knew or should have known that the Wheel Configuration Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

67.     Mercedes drafted the terms of the Warranty in part by using its exclusive, superior knowledge of the existence and likely manifestation of the Wheel Configuration Defect. Plaintiff and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the Warranty.

28

Plaintiff's acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. Mercedes knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to wit, the Wheel Configuration Defect. Plaintiff and Class Members, on the other hand, had no notice of or ability to detect the Wheel Configuration Defect prior to purchasing the Class Vehicles. For this reason, the terms of the Warranty unreasonably favored Mercedes over Plaintiff and Class Members, and Plaintiff's and Class Members' acceptance of the Warranty's durational limitations, to the extent they are found to apply so as to exclude instances where the Wheel Configuration Defect manifested outside of them, was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

68.    Defendant's exclusive superior knowledge of the existence of the Wheel Configuration and when it would manifest influenced its analysis of the Wheel Configuration Defect and whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within the durational limits, a recall is only fractionally more expensive than warranty repairs; if it is more likely to manifest outside those limits, a recall is exponentially more expensive than warranty repairs.)

69.    Plaintiff was also not aware and could not have been aware that Mercedes would willfully not inform him of the Wheel Configuration Defect which affects the safety of their vehicles and that the Wheel Configuration Defect could manifest outside of the durational limit of the Warranty, despite Defendant's knowledge of this. *See Carlson v. Gen. Motors Corp*., 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) (""proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the

challenged 'durational limitations' on implied warranties constituted 'overreaching,' and that the disclaimers themselves were therefore 'unconscionable.'")

### TOLLING OF THE STATUTES OF LIMITATIONS

70.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Wheel Configuration Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Wheel Configuration Defect or Defendant's deception with respect to the Wheel Configuration Defect. Defendant and its agents continue to deny the existence and extent of the Wheel Configuration Defect, even when questioned by Plaintiff and members of the Class.

71.     Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a defect and/or the Class Vehicles contained the Wheel Configuration Defect and the corresponding safety risk. As alleged herein, the existence of the Wheel Configuration Defect was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Wheel Configuration Defect or that the Defendant was concealing the Wheel Configuration Defect.

72.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Wheel Configuration Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent

of the Wheel Configuration Defect in Class Vehicles.

73.     Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

74.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), 23(b)(3) and 23(c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

76.     The Class and Sub-Class are defined as:

> **Class**:   All individuals in the United States who purchased or leased any Class Vehicle.
>
> **Nevada Sub-Class**: All members of the Class who reside in the State of Nevada

77.     Excluded from the Class and Sub-Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.   Plaintiff reserves the right to amend the Class and Sub-Class

definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

78.   <u>Numerosity</u>:   Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

79.   <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased Class Vehicles designed, manufactured, and/or distributed by Mercedes. The representative Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that he has incurred or will incur the cost of repairing or replacing the tires, wheels, and/or their components as a result of the Wheel Configuration Defect. Furthermore, the factual bases of Mercedes's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

80.   <u>Commonality</u>:  There are numerous questions of law and fact common to Plaintiff and the Class that are susceptible to common answers and that predominate over any question affecting Class Members individually.   These common legal and factual issues include the following:

(a)    Whether Class Vehicles suffer from the Wheel Configuration Defect;

(b)    Whether the Wheel Configuration Defect constitutes an unreasonable safety risk;

(c)     Whether Defendant knew about the Wheel Configuration Defect and, if so, how long Defendant has known of the defect;

(d)     Whether the Wheel Configuration Defect constitutes a material fact;

(e)     Whether Defendant has had an ongoing duty to disclose the Wheel Configuration Defect to Plaintiff and Class Members;

(f)     Whether Plaintiff and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)     Whether Defendant knew or reasonably should have known of the Wheel Configuration Defect before it sold and leased Class Vehicles to Class Members;

(h)     Whether Defendant should be declared financially responsible for notifying the Class Members of Wheel Configuration Defect and for the costs and expenses of repairing the Wheel Configuration Defect;

(i)     Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace components as a result of the Wheel Configuration Defect;

(j)     Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)     Whether Defendant breached written or implied warranties pursuant to the Magnuson-Moss Warranty Act; and

(l)     Whether Defendant has acted or refused to act on grounds that

apply generally to the Class or Sub-classes.

81.    <u>Adequate Representation</u>:  Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to vigorously prosecute this action.

82.    <u>Predominance and Superiority</u>:  Plaintiff and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afMercedes to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## **FIRST CAUSE OF ACTION**
### **(Breach of Express Warranty)**
### **(On Behalf of the Nevada Sub-Class)**

83.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

84.    Plaintiff brings this cause of action on behalf of himself and Nevada

Sub-Class.

85.     Each Class Vehicle sold by Mercedes included an express warranty that covered the wheels and tires and warranted that Mercedes would repair or replace any defects in materials and workmanship in the class vehicles.

86.     Mercedes provided all purchasers and lessees of the Class Vehicles with a written warranty "for 48 months or 50,000 miles, whichever occurs first" that "starts on the date the vehicle is delivered to the first retail purchaser or put in service as an Authorized Mercedes-Benz Dealership demonstrator … but no later than 18 months from the vehicle production date." Additionally, the tires supplied with the Class Vehicles "are covered against defects in material or workmanship for the period of 12 months and/or 12,000 miles from date of delivery or when the vehicle was put in service."

87.     As a result of Mercedes's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Wheel Configuration Defect, Plaintiff and Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels and/or tires are substantially certain to fail before their expected useful life has run.

88.     Mercedes provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain. Accordingly, Mercedes's express warranty is an express warranty.

89.     Mercedes manufactured and/or installed the wheels, tires, and its component parts in the Class Vehicles, and the wheels, tires, and their component parts are covered by the express warranty.

90.     Mercedes provided all purchasers and lessees of the Class Vehicles

with a New Vehicle Limited Warranty for 48 months or 50,000 miles, and a warranty applicable to tires for 12 months or 12,000 miles.

91.     On information and belief, Mercedes breached the express warranty by purporting to repair the wheels and/or tires and its component parts by replacing the defective or damaged components with the same defective components and/or instituting temporary fixes, on information and belief, to ensure that the Wheel Configuration Defect manifests outside of the Class Vehicles' express warranty period.

92.     Plaintiff and the Nevada Sub-Class gave Mercedes notice of its breach by presenting their vehicles to Mercedes dealerships for repairs that were not made and/or by providing formal written notice to Mercedes.

93.     However, Plaintiff was not required to notify Mercedes of the breach and/or was not required to do so because affording Mercedes a reasonable opportunity to cure its breach of written warranty would have been futile. Mercedes was also on notice of the defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the wheels, tires, or components thereof, and through other internal sources.

94.     As a direct and proximate cause of Mercedes's breach, Plaintiff and Sub-Class Members suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and Nevada Sub-Class Members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

95.     Additionally, Mercedes breached the express warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranty, Mercedes falsely informed class members that there was no problem with their

vehicle, or replaced defective components with equally defective components, without actually repairing the vehicles.

96.     Plaintiff and Nevada Sub-Class Members are entitled to legal and equitable relief against Mercedes, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

<u>**SECOND CAUSE OF ACTION**</u>

**(Violation of the Nevada Deceptive Trade Practices Act**

**Nev. Rev. Stat. § 598.0903, *et seq.*)**

**(On Behalf of the Nevada Sub-Class)**

97.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     Plaintiff brings this cause of action on behalf of himself and Nevada Sub-Class.

99.     The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq*. prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as

advertised"; or "15. Knowingly makes any other false representation in a transaction."

100.    Defendant's actions as set forth below occurred in the conduct of trade or commerce.

101.    By failing to disclose and concealing the defective nature of the Class Vehicles' wheels and/or tires from Plaintiff and Class Members, Defendant violated the Nevada DTPA, as it represented that the Class Vehicles and their wheels and tires had characteristics and benefits that they do not have and represented that the Class Vehicles and their wheels and tires were of a particular standard, quality, or grade when they were of another.

102.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

103.    Defendant knew and continues to know that the Class Vehicles and their wheels and/or tires suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

104.    Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the wheels and/or tires, and/or the associated repair costs because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' wheels and/or tires;

      b.    Plaintiff and Class Members could not reasonably have been expected to learn or discover that their wheels and/or tires had a dangerous safety defect until it manifested; and

      c.    Defendant knew that Plaintiff and Class Members could not

reasonably have been expected to learn of or discover the safety defect.

105.   In failing to disclose the defective nature of the wheels and/or tires, Defendant knowingly and intentionally concealed and continues to conceal material facts and breached its duty not to do so.

106.   The facts Defendant concealed from or failed to disclose to Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less.  Had they known that the Class Vehicles' wheels and/or tires were defective, Plaintiff and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

107.   Plaintiff and Class Members are reasonable consumers who do not expect the wheels and/or tires installed on their vehicles to exhibit problems such as tire blowouts.

108.   This is the reasonable and objective consumer expectation relating to vehicle wheels and/or tires.

109.   Plaintiff and the Sub-Class are entitled to equitable relief.

## THIRD CAUSE OF ACTION

**(Breach of Common Law Implied Warranty of Merchantability and Breach of Implied Warranty Pursuant to Nev. Rev. Stat. §§ 104.2314 and 104A.2212)**

**(On Behalf of the Nevada Sub-Class)**

110.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

111.   Plaintiff brings this cause of action against Defendant individually and

on behalf of the Nevada Sub-Class.

112.   Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

113.   Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their wheels and/or tires suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

114.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels and/or tires that were manufactured, supplied, distributed, and/or sold by Mercedes were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their wheels and/or tires would be fit for their intended use while the Class Vehicles were being operated.

115.   Contrary to the applicable implied warranties, the Class Vehicles and their wheels and/or tires at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including but not limited to, the defective design of their wheels and/or tires.

116.   The alleged Wheel Configuration Defect is inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

117.   As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Wheel Configuration Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheel and tire components are substantially certain to fail before their expected useful life has run.

118.   Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Nevada Common Law Implied Warranties and Nevada Revised Statutes §§ 104.2314 and 104A.2212.

<u>FOURTH CAUSE OF ACTION</u>

**(Breach of Express Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq*.)**

**(On Behalf of the Class)**

119.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120.   Plaintiff brings this cause of action on behalf of himself and on behalf of the Class against Defendant.

121.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under Nevada law.

122.   The wheels, tires, and their component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

123.   According to Mercedes, "This warranty is for 48 months or 50,000 miles, whichever occurs first."

124.   The warranty contains the following statements:

> (a)   "Your vehicle is covered under the terms of these warranties and your Authorized Mercedes-Benz Dealership will exchange or repair any defective parts in accordance with the terms of such warranties within stated limits."

> (a)   "DEFECTS: Mercedes-Benz USA, LLC (MBUSA) warrants to the original and each subsequent owner of a new Mercedes-Benz vehicle that any Authorized Mercedes-Benz Dealership will make any repairs or replacements necessary to correct defects in material or workmanship, but not design, arising during the warranty period."

125.   Defendant breached the express warranties by selling and leasing Class Vehicles with wheels and/or tires that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the wheels, tires, and their component parts.  Mercedes has failed to "repair" the defects as alleged herein.

126.   Plaintiff was not required to notify Mercedes of the breach or was not required to do so because offering affording a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the wheels and tires, and from other internal sources.

127.   As a direct and proximate cause of Defendant's breach, Plaintiff and

the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

128.   Plaintiff and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## **FIFTH CAUSE OF ACTION**

**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2303 *et seq*.)**
**(On Behalf of the Class)**

129.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

130.   Plaintiff brings this cause of action against Defendant on behalf of himself and on behalf of the Class.

131.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

132.   Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

133.   Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

134.   Mercedes impliedly warranted that the Class Vehicles were of merchantable quality and fit for use.  This implied warranty included, among other

things: (i) a warranty that the Class Vehicles and their wheels and tires were manufactured, supplied, distributed, and/or sold by Mercedes would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels and tires would be fit for their intended use while the Class Vehicles were being operated.

135.   Contrary to the applicable implied warranties, the Class Vehicles and their wheels and tires at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.   Instead, the Class Vehicles are defective, including the Wheel Configuration Defect.

136.   Defendant's breach of implied warranties has deprived Plaintiff and Class Members of the benefit of their bargain.

137.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

138.   Defendant has been affording a reasonable opportunity to cure its breach, including when Plaintiff and Class Members brought their vehicles in for diagnoses and repair of the Wheel Configuration Defect.

139.   As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiff and Class Members sustained and incurred damages and other losses in an amount to be determined at trial.  Defendant's conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

140.   As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class Members have incurred damages.

## SIXTH CAUSE OF ACTION
### (For Unjust Enrichment)
### (On Behalf of the Class)

141.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

142.   Plaintiff brings this cause of action on behalf of himself and the Class.

143.   As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles.  Although these vehicles are purchased and leased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

144.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiff and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

145.   Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiff and Class Members.

146.   As a result of the Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

147.   Plaintiff does not seek restitution under their Unjust Enrichment claim. Rather, Plaintiff and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

148.   Additionally, Plaintiff seeks injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff also seeks injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class Members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## SEVENTH CAUSE OF ACTION

### (For Fraud by Omission or Fraudulent Concealment)
### (On Behalf of the Class)

149.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

150.   Plaintiff brings this cause of action on behalf of himself and on behalf of the Class against Defendant.

151.   Defendant knew that the Class Vehicles suffered from an inherent Wheel Configuration Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

152.   Defendant concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles.

153.   Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles because:

46

a.   Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b.   The omitted facts were material because they directly impact the safety of the Class Vehicles;

c.   Defendant knew the omitted facts regarding the Wheel Configuration Defect were not known to or reasonably discoverable by Plaintiff and Class Members;

d.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members.

154.   The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a vehicle's wheels and/or tires are defective, causing tire blowouts, is a material safety concern. Had Plaintiff and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

155.   Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiff and Class Members to act thereon. Plaintiff and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff and Class Members' purchase or lease of Defendant's defective Class

Vehicles.

156.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

157.    As a direct and proximate result of Defendant's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Plaintiff and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

158.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CAUSE OF ACTION
### (For Declaratory and Injunctive Relief)
### (On Behalf of the Class)

159.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

160.    Plaintiff brings this cause of action on behalf of himself and the Class against Defendant.

161. As illustrated in the foregoing allegations, there is an actual controversy between Mercedes and Plaintiff concerning: (1) whether the wheels and/or tires found in Class Vehicles are defectively designed and manufactured; (2) whether Mercedes knew, or should have known, of that Wheel Configuration

Defect; (3) whether Mercedes knew, or should have known, that the Wheel Configuration Defect would impact the safety and performance of the Class Vehicles.

162.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provided that the declaratory relief requested does not fall within any of the exemptions set forth in the Act.

163.   Plaintiff asks this Court for an order enjoining Mercedes from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Mercedes to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Mercedes to repair and eliminate the Wheel Configuration Defect from every Class Vehicle; enjoining Mercedes from selling the Class Vehicles with the misleading information; and/or compelling Mercedes to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed.

## RELIEF REQUESTED

164.   Plaintiff, on behalf of himself and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

> (a)   An order certifying the proposed Class and Sub-Class, designating Plaintiff as a named representative of the Class, and designating the undersigned as Class Counsel;

> (b)   A declaration that Defendant is financially responsible for notifying all Class Members of the Wheel Configuration

Defect;

(c)     An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to repair and eliminate the Wheel Configuration Defect from every Class Vehicle; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d)     An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e)     Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f)     Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

(g)     A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiff and Class Members;

(h)     An award of attorneys' fees and costs, as allowed by law;

(i)     An award of pre-judgment and post-judgment interest, as

provided by law;

(j)     Leave to amend the Complaint to conform to the evidence produced at trial; and

(k)     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

165.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues in this action so triable.

Dated:  May 7, 2024                Respectfully submitted,


/s/ *Nathaniel J. Heber*
Nathaniel James Heber
Georgia Bar No. 821058
HEBER LAW FIRM LLC
3355 Lenox Road NE, Suite 750
Atlanta, GA 30326
Tel: (404) 905-8470
Fax: (470) 805-2016
Email: nathan@heberfirm.com


Tarek H. Zohdy (*pro hac vice* forthcoming)
Cody R. Padgett (*pro hac vice* forthcoming)
Laura E. Goolsby (*pro hac vice* forthcoming)
Nathan N. Kiyam (*pro hac vice* forthcoming)
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel: (310) 556-4811
Fax: (310) 943-0396

Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com
Nate.Kiyam@capstonelawyers.com

## CERTIFICATION OF COUNSEL

I hereby certify that the foregoing CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL has been prepared with Times New Roman, 14-point font, one of the font and point selections approved by the Court in LR 5.1.

/s/ *Nathaniel J. Heber*
Nathaniel James Heber
Georgia Bar No. 821058

1